ERIC R. LEVINE (EL-7677)
EISEMAN LEVINE LEHRHAUPT
& KAKOYIANNIS, P.C.
845 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL:  212-752-1000
FAX:  212-355-4608

AND

LAURENCE MAY
ANGEL & FRANKEL, P.C.
460 Park Avenue
New York, New York 10022-1906
Tel:  212-752-8000
Fax:  212-752-8393

CO-COUNSEL FOR PETITIONER KEVIN WALTZER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re

                                        CASE NO.  04-43361  (ALG)
AMANAT, OMAR SHARIF,
                                        CHAPTER 7
                        DEBTOR.
-------------------------------------------------------x


**AFFIRMATION**


        ERIC R. LEVINE, declares and affirms as true, pursuant to 28 USC 1746 and

Fed. R. Bankr. P. 9012(b), the following statements:

        1.  I am a member of the firm of Eiseman Levine Lehrhaupt & Kakoyiannis,

P.C., co-counsel along with Angel & Frankel, P.C., for petitioner Kevin Waltzer

("Waltzer").  I submit this affirmation in support of Waltzer's motion for an order,

pursuant to 11 USC 303(g)[1] and Fed. R. Bankr. P. 2001(a)[2], directing the United States

Trustee to appoint an interim trustee to take possession of the property of the estate and

operate any business of the Debtor.

2.   In my role as principal counsel for Waltzer in his litigation against the Debtor,

I have acquired personal knowledge of the facts and circumstances described below.

### SUMMARY

3.   As discussed more fully below, this motion must be heard on an expedited

basis and an interim trustee must be appointed because the Debtor was and is actively

engaged in efforts to secrete assets and otherwise place them beyond the reach of

creditors such as Waltzer.  The Debtor's conduct includes (1) making false statements

under oath concerning the state of his finances, (2) concealing assets from creditors, (3)

transferring substantial sums of money to an offshore account in the Cook Islands (4)

engaging in fraudulent no-consideration transfers and (5) orchestrating the

commencement of this involuntary proceeding in an effort to frustrate his creditors.

---

[1] Bankruptcy Code Section 303(g) states in its pertinent part:

> At any time after the commencement of an involuntary case under Chapter 7 of
> this title but before an order for relief in the case, the court, on request of a party
> in interest, after notice to the debtor and a hearing, and if necessary to preserve
> the property of the estate or to prevent loss to the estate, may order the United
> States trustee to appoint an interim trustee under section 701 of this title to take
> possession of the property of the estate and to operate any business of the
> debtor.

[2] Bankruptcy Rule 2001(a), "Appointment of Interim Trustee Before Order for Relief in a Chapter 7
Liquidation Case," provides

> At any time following the commencement of an involuntary liquidation case and
> before an order for relief, the court on written motion of a party in interest may
> order the appointment of an interim trustee under § 303(g) of the Code. The
> motion shall set forth the necessity for the appointment and may be granted only
> after hearing on notice to the debtor, the petitioning creditors, the United States
> trustee, and other parties in interest as the court may designate.

4.   Moreover, because Waltzer has such a large claim against the Debtor (he has a $6,665,210 judgment) the appointment of an interim trustee will cause no prejudice to the Debtor because to the extent that the Debtor has assets, he has no equity in those assets. The property in the Debtor's estate is owed to Waltzer, and, in essence, the Debtor's assets belong to Waltzer.  In contrast, if an interim trustee is not appointed, Waltzer will be irreparably harmed because of the Debtor's ongoing efforts to move assets beyond Waltzer's reach.

## BACKGROUND ABOUT THE DEBTOR

5.   The Debtor is Omar Sharif Amanat ("Amanat"), an individual.  He is the Chief Executive Officer of, and through his family trusts, is a major shareholder of, a company called MarketXT Holdings Corp., a Chapter 7 debtor in a putative involuntary case in this Court, titled *In re MarketXT Holdings, Corp.*, Case No. 04-12078 (ALG). *See* Transcript of Deposition of Omar Amanat, dated April 30, 2004 ("Amanat 4/30/04 Dep.") at page 320, lines 12 to 16. (Hereafter page and line citations are as follows:  P 320/L 12-16).  A copy of the 4/30/04 Transcript is attached as Exhibit A to the separately bound set of Exhibits.  *See also* Transcript of Deposition of Omar Amanat, dated January 8, 2004 ("Amanat 1/8/04 Dep.") at P 104/L 7-11; P 106/L 6-14 and P 109/L 10-22.  A copy of the Amanat 1/8/04 Transcript is attached as Exhibit B to the separately bound set of Exhibits.

6.   The *MarketXT* case was commenced on or about March 26, 2004.  No order for relief has been entered, and a hearing on MarketXT's motion to dismiss is scheduled for trial in December, 2004.

3

## BACKGROUND ABOUT WALTZER

7.   Waltzer joined the instant involuntary Chapter 7 petition, dated November 9, 2004, (the "Petition") by Joinder, dated November 11, 2004.  Copies of the Petition and Waltzer's Joinder are attached as Exhibit C to the separately bound set of Exhibits.

8.   Waltzer has standing to join the Petition by virtue of his judgment against Amanat in the amount of $6,665,210 entered on October 5, 2004 (the "Judgment") in an action in the New York Supreme Court against Amanat, MarketXT and others, titled *Kevin Waltzer v. Tradescape & Co., L.L.C, et al.*, N.Y. Co. Index No. 603415/2001 (the "Waltzer Action")[3].  A copy of the Judgment is attached as Exhibit E to the separately bound set of Exhibits.

### Nature Of Waltzer Action

9.   The Waltzer Action alleged fraud and breach of fiduciary duty by Amanat (the CEO of MarketXT) and others.  In brief, as established in the Waltzer Action:  (i) in November, 1996, Waltzer provided $250,000 seed money to Amanat to fund the creation of a business -- of which Amanat and his father were the managing members --  variously named "C. S. Block," "Tradescape" and "MarketXT," (ii) in exchange for his investment, Waltzer received 7½ % ownership interest in the business, (iii) on December 21, 1998, Amanat and the other defendants defrauded Waltzer into selling his interest by representing to Waltzer that the business was doing poorly when, in truth, the business was doing extremely well and was about to receive tens of millions of dollars in new

---

[3] By order dated November 3, 2004, this Court, in the *MarketXT* case modified the automatic stay to permit entry of judgment for $6,665,210 against MarketXT in the Waltzer Action.  Proceedings in the Supreme Court to enter said judgment are pending.  A copy of this Court's order is attached as Exhibit D to the separately bound set of Exhibits..

investments, (iv) following the investments, the operating companies of the business were sold to E*Trade Financial Corp. in June 2002, for approximately $100 million dollars worth of E*Trade stock.  Copies of the Amended Complaint, dated January 16, 2003, without its exhibits in the Waltzer Action and the Supreme Court's order, dated December 11, 2003 and entered on December 19, 2003, which struck Amanat's answer (thereby establishing the allegations of Waltzer's complaint) and directed an inquest on damages are attached to the separately bound set of Exhibits as Exhibits F and G, respectively.

10. Following the damages inquest in March, 2004, by Decision, dated September 23, 2004, (the "Decision") the Supreme Court awarded Waltzer the sum of $4.38 million, plus pre-judgment interest from December 21, 1998, representing the difference between the amount Waltzer received when he sold and the fair market value of his 7½ % interest in the companies which were worth $62.2 million, as of the date he sold.  A copy of the Decision is annexed to the separately bound set of Exhibits as Exhibit H.

11. On October 5, 2004, Waltzer entered the Judgment, Exhibit E, against Amanat (and his father, co-defendant Sharif Amanat) in the amount of $6,665,210, representing the award, prejudgment interest and costs, as taxed by the clerk.

### GROUNDS FOR APPOINTING AN INTERIM TRUSTEE

**12.** As discussed more fully below, Amanat's conduct justifying the appointment of an interim trustee includes:  (1) making false statements under oath concerning the state of his finances, (2) concealing assets from creditors, (3) transferring substantial sums of money to offshore accounts (4) engaging in fraudulent no-consideration transfers

and (5) orchestrating this involuntary proceeding to be commenced in an effort to frustrate his creditors.

**13.** Pre-Petition, Amanat has engaged in a systematic course of conduct intended to place his assets beyond the reach of his creditors. No doubt encouraged by the lengthy gap period in the *MarketXT* case, Amanat hopes to take advantage of the gap period in this case to continue to secrete assets, protected from creditor enforcement proceedings by the automatic stay.

**Amanat Transferred Assets In
Violation Of An Order Of Attachment**

14. After liability was established in the Waltzer Action, Waltzer moved for and was granted an Order of Attachment, dated December 19, 2003 (the "Order of Attachment"). A copy of the Order of Attachment is attached to the separately bound set of Exhibits as Exhibit I.

15. The Order of Attachment, in the amount of $10,504,547.68, exclusive of costs was based upon Waltzer's showing that, *inter alia*, Amanat was attempting to "dispose of, encumber or secrete property, or remove it from the state, for the purpose of defrauding Waltzer or frustrating his enforcement of his upcoming judgment." A copy of Eric R. Levine's Affirmation, dated December 12, 2003, in support of the attachment is annexed to the separately bound set of Exhibits as Exhibit J. Thus, the New York Supreme Court, which has come to know Amanat well, reached the conclusion that he was trying to secrete assets and defraud his creditor, Waltzer.

16. Pursuant to the Order of Attachment, Waltzer attached, amongst other things, Amanat's real property in Queens, located at 5181 74th Street, Flushing, NY 11373-4158.

17. In violation of the Order of Attachment, Amanat purported to transfer the Queens property to his brother, Osman Amanat, months after the Order of Attachment had been issued. Amanat might have succeeded, but he arrived at the Queens County Clerk's Office 2 hours and five minutes after the Sheriff had levied on the Queens property by filing a Notice of the Order of Attachment. Attached to the separately bound set of Exhibits collectively as Exhibit K are copies of the Notice of Attachment, dated April 14, 2004, and the Clerk's records showing that the Notice was filed on May 10, 2004 at 14:30 and the deed from Amanat to Osman Amanat was filed on May 10, 2004 at 16:35.

**Amanat Testified Falsely About His**
**Assets To Conceal Them From Creditors**

18. Pursuant to the Order of Attachment, Amanat was deposed on January 8, 2004 and April 30, 2004 for the purpose of locating additional assets which could then be attached. *See* Amanat 1/8/04 Dep. and Amanat 4/30/04 Dep. In his deposition, Amanat testified that apart from one bank account at Citibank and one brokerage account at Smith Barney, he had no other accounts anywhere in the world. *See* Amanat 1/8/04 Dep. P 38/L 21 to P 39/L 19; P 41/L 23 to P 42/L 2; Amanat 4/30/04 Dep. P 268/L 11 to P 269/L 12. Indeed, he testified that he had no other brokerage accounts anywhere else in the world since January 2003. *See* Amanat 1/8/04 Dep. P 41/L 23 to P 42/L 2.

19. Despite Amanat's denials that he had assets, after the Judgment was entered, Waltzer began supplementary proceedings in order to locate assets.  In the course of serving subpoenas on non-party garnishees, Waltzer learned that Amanat's prior testimony was false:  Amanat has several undisclosed bank and brokerage accounts, including one in the Cook Islands.

20. Specifically, while there may be others, Waltzer has learned that Amanat has established accounts at:

- United States Trust Company of New York ("US Trust"),
- Sanford C. Bernstein & Co. ("Sanford Bernstein"),
- Epic Investment Trust, a Cook Islands trust,
- Ash Capital and
- Goldman Sachs.

### US Trust

21. Among the subpoenas Waltzer issued was one to US Trust.   In its response, US Trust revealed that Amanat has a bank account with more than $100,000 on deposit. Copies of the subpoenas, dated October 13, 2004 and October 15, 2004, and US Trust's responses, dated October 27, 2004 and November 4, 2004, are attached to the separately bound set of Exhibits collectively as Exhibit L.

22. Amanat never disclosed the existence of the US Trust bank account to Waltzer.

### Sanford Bernstein

23. After the Judgment was entered Waltzer served subpoenas and/or restraining notices on a number of non-party garnishees, including Bridges TV and Bridges Network, Inc. (collectively "Bridges").  In response to the notice, Bridges provided

certain pleadings from two New York Supreme Court lawsuits between Bridges and

Amanat, one in Erie County and one in New York County, including an affidavit of

Amanat's, sworn to June 25, 2004.  In his affidavit, Amanat testified, among other things,

that "[o]n July 31, 2003 [he] transferred $100,000 in capital to Bridges."   Also included

in the documents from Bridges was a schedule of Amanat's assets based on documents

and communications it received from Amanat, himself.  Paragraph 2 of the schedule

states in relevant part:  "The wire transfer of the original $100K in July 2003 came

from… [an account at] Sanford C. Bernstein & Co."   The existence of Amanat's

Sanford Bernstein account was confirmed to me in an email of November 6, 2004, from

Muzzammil S. Hassan, Bridges' founder, in which he identified the specific Amanat

account at Sanford Bernstein from which Bridges received the $100,000.  Copies of the

Amanat's schedule of assets complied by Bridges and its email to me are attached to the

separately bound set of Exhibits collectively as Exhibit M.

24. Amanat failed to disclose the Sanford Bernstein account to Waltzer.

25. What makes Amanat's affidavit all the more insidious is that in the Waltzer

Action, Amanat testified on January 8, 2004 -- 6 months after testifying in the *Bridges*

action that he had invested $100,000 -- that he had never invested any money in Bridges

and that the company was worthless.  *See* Amanat 1/8/04 Dep. P 124/L 16 to P 126/L 3; P

135/L 22 to P 138/L :5.

26. Specifically, Amanat testified:

> Q:  Do you believe that you have an ownership interest in
>     Bridges?
> A:  Do I believe I have an ownership interest?  I believe I
>     did,  yes….It is not—for me, it is not worth fighting over.
>     It is not really worth anything.

9

*See* Amanat 1/8/04 Dep. P 125/L 17-24

> Q:  How much money were you supposed to have invested?
> A:  A hundred thousand.
> Q:  That's your understanding of what you were supposed to
>      invest?
> A:  Yes.
> Q:  Did you invest a hundred thousand?
> A:  I'm sorry I was supposed to invest 600,000.
> Q:  Did you invest 600,000?
> A:  No.
> **Q:  Did you invest anything?**
> **A:  No**.

*See* Amanat 1/8/04 Dep. P 36/L 2-13 (Emphasis added).

27. When asked why he did not invest in Bridges, Amanat replied "I didn't have

it."  *See* Amanat 1/8/04 Dep. P 138/L3-5.  In truth, Amanat had the money but he did not

want Waltzer to know.

28. However, Amanat's perfidy does not end here.  In addition to the $100,000

investment in Bridges, Amanat made a further $500,000 investment, using proceeds from

yet another undisclosed account, discussed below.

### *Epic Investment Trust*

29. The Epic Investment Trust is located in the Cook Islands, one of the

jurisdictions known for its bank secrecy laws.

30. In an affidavit in the *Bridges* Action, sworn to June 25, 2004, Amanat testified

that "[o]n August 29, [2]003 I transferred $500,000 in additional capital into a market-

neutral hedge fund in Bridges name."  Omar Aff. at para. 13.   As discussed above, in his

deposition in the Waltzer Action, Amanat denied under oath that he made any investment

in Bridges which he described as a worthless company.  A copy of Amanat's Affidavit,

sworn to June 25, 2004, without its exhibits is attached to the separately bound set of

Exhibits as Exhibit N.

31. The fact that Amanat invested a total of $600,000 is confirmed at page 3 of a
Memorandum of Law submitted by Amanat in support of his motion to vacate a default
judgment in the *Bridges* action . "On July 31, 2003, Amanat transferred $100,000 in
capital to Bridges.  On August 29, 2003 … Amanat invested an additional $500,000 in
Bridges in a hedge fund of Amanat's choosing."  A copy of the Memorandum of Law,
dated June 25, 2004, without its exhibits, is attached to the separately bound set of
Exhibits as Exhibit O.

32. The question then becomes, what was the source of this additional $500,000?
Among the documents provided by Bridges was a document entitled ASH MASTER
FUND II, LLC; Assignment Assumption, Consent and Amendment Agreement, dated
August 29, 2003 (the "Ash Agreement") -- the date Amanat claims to have transferred
the $500,000 to Bridges. *See* above.  Pursuant to the terms of the Ash Agreement, Ash
General Partner LLC ("Ash GP") controlled Epic Investment Trust, a Cook Islands trust
("Epic"). Pursuant to Amanat's instruction to Ash GP, it transferred $500,000 from Epic
to Bridges.  A copy of the Agreement is attached as Exhibit P to the separately bound set
of Exhibits.

33. Amanat's connection to Ash related entities does not end here.

### Ash Capital

34. Listed in item 1 in the schedule of assets put together by Bridges, Bridges
states that Amanat told them that he had **"$10 million sitting"** in an account at Ash
Capital in Brookline, Massachusetts.  *See* Exh. M.

35. Amanat failed to disclose any of the Ash related accounts to Waltzer.

### *Goldman Sachs*

36. As referenced in item 4 of the schedule of Amanat's assets as compiled by Bridges, on September 13, 2002, Amanat set up an account for Bridges at Goldman Sachs by transferring money "**from [Amanat's] own account at GS**…" *See* Exh. M.

37. Amanat failed to disclose the Goldman Sachs account to Waltzer.

**Amanat's Lavish Lifestyle Betrays**
**<u>The Existence Of Undisclosed Assets</u>**

38. Additional evidence that Amanat is concealing assets comes from the disparity between his reported income and assets versus his expenditures.  He lives beyond his stated means and this indicates that he has undisclosed assets.

39. As discussed below, despite reporting an income of less than $50,000 and modest assets, it appears that Amanat spent between $650,000 and $750,000 in 2004 on non-living expenses.  If we add his $96,000 to $144,000 in annual variable rate interest payments on his mortgage, Amanat's expenditures total between $746,000 and $844,000.

### *Omar Claims To Have A Modest Income*
### *And Apart From His Home, Few Assets*

40. According to his 2002 federal income tax return (the most recent one he provided), Amanat's wages and salary (W-2 income) was $27,960; his capital gains (from trading stock) were $17,810 and his income from interest and dividends was less than $2,000.  A copy of his 2002 Federal Income Tax Return is attached as Exhibit Q  to the separately bound set of Exhibits.

41. In his deposition in connection with the Order of Attachment, Amanat painted a modest financial picture.

42. According to Amanat's testimony, in 2003, he was paid approximately $150,000 by Tradescape (a/k/a MarketXT).  *See* Amanat 1/8/04 Dep. p 75/L 4-18.  In 2004, he may have received as little as $10,000 in salary from Tradescape.  See Amanat 4/30/04 Dep. P 264/L 5-16.  He received no salary or wages from anyone else.  P 265/L 10-12.

43. According to Amanat's testimony, he has one brokerage account and one bank account.  *See* Amanat 1/8/04 Dep. P 76/L 5-17.  See Amanat 4/30/04 Dep.  P 268/L 11 to P 269/L 12.

44. According to Amanat's testimony, there is only $100,000 in his brokerage account at Smith Barney and a "de minimus" sum in his Citibank account.   *See* Amanat 1/8/04 Dep. P 76/L 5-17.

45. According to Amanat's testimony, he owns apartment 7-C, a condominium located at 15 East 69th Street, NY, NY 10021.  *See* Amanat 1/8/04 Dep.  P64/L 11-23.  The apartment was purchased for $3.8 million, is now worth $4 million and is encumbered by two mortgages in favor of US Trust in the total amount of $2.8 million.  *See* Amanat 1/8/04 Dep.  P 67/L 4-17; P 64/L 24 to P 65/L 3.  *See also* US Trust's response to subpoena, Exh. L.

46. According to Amanat's testimony, the apartment is his only substantial asset.  Aside from his apartment, the only other piece of real property he owns anywhere in the world is the house in Queens. It is worth $150,000.  *See* Amanat 1/8/04 Dep.  P70/L 16-23; P 71/L 13-15; P 73/L 18-22.  *See also* Amanat 4/30/04 Dep. 261/L 14-16.

47. According to Amanat's testimony, he owns no other assets.  *See* Amanat 1/8/04 Dep. P 76/L 5-14.  *See* Amanat 4/30/04 Dep. P 320/L 17-42.

***Omar Spends Lavishly***

48. As discussed above Amanat lives in a condominium located at 15 East 69th Street. The two bedroom, three-bathroom apartment carries a $2.8 million mortgage which costs Amanat between $8,000 and $12,000 a month, or $96,000 to $144,000 a year. *See* Amanat 4/30/04 Dep. P 254/L12 to P 255/L 2. See Exh. L.

49. Of course, Amanat has many other expenses, such as real property taxes ($15,000 a year. *See* Amanat 1/8/04 Dep. P 120/L9-10), common charges, food, clothing, utilities, travel, entertainment, etc. In addition, he has the expenses associated with having two children and new baby. *See* Amanat 1/8/04 Dep. P 106/L15-19; Transcript of proceedings in *MarketXT* case held on September 9, 2004 P 7/5-7. A copy of the Transcript is attached as Exhibit R to the separately bound set of Exhibits.

50. Further evidence of hidden assets was obtained in September 2004, when in order to assist MarketXT in its putative bankruptcy case, Amanat personally paid off the debt of one of its petitioning creditors, the firm of Wollmuth, Maher & Deutsch. Wollmuth's claim was for approximately $500,000**.** *See* Transcript of proceedings in *MarketXT* case held on September 23, 2004, P 7/L 21-23; P 12 L/6-8. A copy of the Transcript is attached as Exhibit S to the separately bound set of Exhibits.

51. Further undermining Debtor's claims of fiscal constraints are his recent charitable contributions. For example, he was a Dinner Co-Chair at the Human Rights Watch Annual Dinner held in New York on November 9, 2004. In order to become a co-chair, Amanat had to donate between $25,000 and $100,000. A copy of the donor's page from Human Rights Watch website is attached as Exhibit T to the separately bound Exhibits.

52. In 2004, Amanat donated between $25,000 and $50,000 to Lincoln Center for the Performing Arts.  A copy of the donor's page from Lincoln Center's website is attached as Exhibit U to the separately bound Exhibits.

53.  Amanat was a Chair of South Asians For Kerry in connection with a "special luncheon" held on July 9, 2004 in New York.  In order to be a Chair, Amanat had to commit to a donation of $100,000.  A copy of the donor's page from the organization's website is attached as Exhibit V to the separately bound Exhibits.

54. In sum, despite reporting $46,000 in income and modest assets, Amanat (i) paid off MarketXT's corporate debt of $500,000, (ii) donated between $150,000 and $250,000[4] and (iii) paid between $96,000 and $144,000 in mortgage payments.

55. Clearly, Amanat is hiding assets.

56. Although Amanat has in the past asserted that his wife, Sabiya, pays certain expenses, *see* Amanat 1/8/04 Dep. P 80/L5-14, she is a pediatric dentist and part-time Assistant Clinical Professor of Dentistry at Columbia Presbyterian.  *See* Amanat 1/8/04 Dep. P119/L 14-16.  See also relevant pages from Columbia's website which are attached as Exhibit W to the separately bound Exhibits.  Mrs. Amanat reports few, if any assets of her own.  For example, based on the joint financial statement Sabiya and Omar Amanat submitted to US Trust in connection with their mortgage application, she appears to have no substantial assets.  See Exh. L.  Amanat denies that he has given her any money.  S*ee* Amanat 1/8/04 Dep. P119/L 2-10.  It is dubious that she could pay the $96,000 to $144,000 annual mortgage payments using her own income and assets., let alone any other expenditures discussed above.

---

[4] It appears that the payment to Wollmuth and most, if not all of the payments to the charities/non-profits were made within the preference period and thus are part of the Debtor's estate.

**Amanat Appears To Have**
**Engaged In A Fraud Upon This Court**

57. There are many reasons to conclude that Amanat colluded with the first petitioning creditor, Jeffrey Malonda ("Malonda"), to file this case for the purpose of causing delay.  As discussed below, Malonda's explanation for filing the Petition makes no sense, the timing of the filing is highly suspicious and the alleged claim itself is a frivolous basis for commencing an involuntary chapter 7 case.

58. On November 16, 2004, I telephoned Malonda to discuss this case with him. The facts disclosed during that conversation lead to the suspicion that Amanat is behind Malonda's Petition.  Malonda stated that for a period of 7 months in or about 2002 he worked for Amanat and Tradescape as an office assistant.  The nature of his alleged claim is reimbursement of expenses such as telephone bills, gasoline and "whatnot," such as having Amanat's car washed.  The advice to file the involuntary Petition came from a "friend" who said it would be "the best way to get paid."

59. Amongst other things, the conversation with Malonda raises the following concerns.  How does an office assistant run up $15,000 in expenses consisting of telephone charges, gasoline and unspecified whatnot in only 7 months?  How can an office assistant afford to advance so much money?  Why would someone wait two years to commence a proceeding to be reimbursed?  Why is a claim for reimbursement described in the Petition as "Contract Debt owed for services rendered"?

60. However, the Court need not go behind the Petition to conclude that it is suspicious.  The Petition on its face is suspicious.

61. Another badge of fraud is the timing of this allegedly involuntary Petition. It could not come at a better time for Amanat. Waltzer recently obtained his Judgment for more than $6.6 million dollars and has been aggressively seeking to enforce it. Only a few days before the Petition was filed, Waltzer located and froze a bank account of Amanat's at US Trust, containing more than $100,000. Exh. L. Just before the Sheriff was to levy upon the account, the Petition was filed.

62. After the Judgment was entered, Waltzer served a subpoena *duces tecum* and *ad testificandum* on Amanat. A copy of the Subpoena is attached as Exhibit X to the separately bound set of Exhibits. Just three days before Amanat was to appear for his deposition, the Petition was filed. The Petition also relieved Amanat of his obligation to produce a wide variety of documents which would have laid bare all his holdings.

63. Indeed, the timing of events is more than just convenient it might even be called supernatural. On the afternoon of November 9, 2004, around 4:00 pm, I received a telephone call from Richard Friedman, Amanat's attorney in the Waltzer Action. Friedman advised that although he had not seen it himself, Amanat told him that an involuntary petition had been filed against him. What makes this appear supernatural is that the Petition was not filed until 4:28 pm and was not available on Pacer until the next day. How did Amanat know of the Petition before it was filed? And even if my conversation with Friedman was as late as 5:00 pm, how did Amanat learn of the Petition in 30 minutes? In my conversation with Malonda, he said he had not spoken to Amanat for months.

64. According to Amanat's attorney in the Waltzer Action, Richard Friedman, to whom I spoke, Amanat was to begin a trial this week as a defendant in another New York Supreme Court action.

65. Finally, according to Frank Balon of Webster Szanyi, LLP, the attorneys for Bridges TV, there is a pending motion for a default judgment, which was returnable on November 18, 2004 in Bridges' action against Amanat in New York Supreme Court, Erie Co. titled *Bridges Network v. Amanat*, Index No. 11175/03.

66. The Petition itself displays several badges of fraud. Malonda alleges that he is owed $15,000 for unidentified "services rendered." This paltry sum hardly justifies the drastic and potentially actionable step of placing an individual into an involuntary chapter 7 case. Under 303(i)(1)(A) and (B), if the Petition were dismissed, Malonda would be exposed to liability for Amanat's costs and attorney's fees. Such costs and fees could easily exceed $15,000.

67. If this Court found that Malonda had filed in "bad faith," he would also be exposed to compensatory and punitive damages. 303(i)(2)(A) and (B).

68. Malonda has exposed himself to a bad faith claim because there appears to no basis for filing the Petition. Malonda alleges, as he must under 303(h)(1), that his basis for the Petition is "[t]he debtor is generally not paying such debtor's debts as they become due, unless such debts are the subject of a bona fide dispute."

69. An alleged debtor's failure to pay a single creditor does not warrant granting an involuntary petition pursuant to 303(h)(1). *In re Arlumsa Development Corp.*, 33 B.R. 981, 982-83 (Bankr. S.D.N.Y. 1983). Thus, on the face of it, Malonda's Petition appears invalid.

70. The non-payment of one debt may only support the allegation that a debtor is "<u>generally</u> not paying its debts as they become due," 303(h)(1)(emphasis added), if the single debtor filing the involuntary petition (1) "would otherwise be without an adequate remedy under non-bankruptcy law if denied an order for relief" or (2) could show "special circumstances amounting to fraud, trick, artifice or scam." *In re LeSher International, Lt*d. 32 B.R. 1, 2 (Bankr. S.D.N.Y. 1982); *see In re Arlumsa Development Corp.*, 33 B.R. at 982-83 (a single debtor should only be permitted to file an involuntary petition pursuant to 303(h)(1) when "exceptional" circumstances exist).

71. Malonda does not fall into the "exceptional" circumstances, which would justify his filing of the Petition. Malonda has an adequate remedy at law outside bankruptcy law (*i.e.*, he could bring an action in state court to collect the debt), and he does not allege, let alone present evidence of a fraud by Amanat. *See In re LeSher International, Lt*d. 32 B.R. at 2 (dismissing involuntary petition brought by a single creditor who had state court remedies available and did not allege fraud); *see also In re Arlumsa Development Corp.*, 33 B.R. at 982-83 (dismissing involuntary petition brought by a single creditor because petitioner had a pending action against debtor in district court and did not provide any support for its allegations that debtor defrauded petitioner).

72. Malonda's allegation that Amanat is "generally" not paying his debts cannot rest on anything he learned from Amanat's judgment creditors because Malonda never bothered to contact them. There are only two judgment creditors of Amanat: Waltzer and Michael Sanderson. Malonda never contacted Waltzer, and, according to Sanderson's counsel, Brown Raysman with whom I spoke, he never contacted them about Sanderson's judgment. So how could Malonda possibly know that Amanat "is

generally not paying [his] debts as they become due." Of course, Amanat has other creditors, but at least according to the positions Amanat has taken in lawsuits with them, those "debts are the subject of . . . bona fide dispute[s]." In short, Malonda appears to have no good faith basis for filing the Petition. Of course, if Malonda is working with Amanat, Malonda would perceive no need to worry about bad faith liability.

*73.* Another suspicious fact is that Malonda has claimed that this case is related to the *MarketXT* case. How did Malonda known about MarketXT's bankruptcy? The likely explanation is that Amanat told him.

### Despite The Fraudulent Origins Of This Case, Waltzer's Joinder Renders It Legitimate.

74. In the belief that an interim trustee would put an end to Amanat's financial misconduct, Waltzer joined the Petition, even though he strongly suspects that it was filed collusively.

75. Although Malonda does not qualify as a single filer, Waltzer does because he can demonstrate special circumstances. The non-payment of a single claim can satisfy the "generally not paying test" under 303(h)(1) if the claim constitutes the "overwhelming portion of the debt." *In re Einhorn*, 29 B.R. 966, 969-70 (Bankr. E.D.N.Y. 1983).[5] Waltzer's $6,665,210 Judgment constitutes the overwhelming portion of the debt owed by Amanat to his creditors.

---

[5] Malonda does not qualify for this exception to the general rule that non-payment of a single debt does not constitute grounds for a 303(h)(1) involuntary petition because the $6,665,210 Amanat owes to Waltzer dwarfs the paltry $15,000 owed to Malonda by Amanat.

76. Furthermore, Waltzer is a permissible solo petitioner because he can show fraud by Amanat. *See In re LeSher International, Lt*d. 32 B.R. 1 (Bankr. S.D.N.Y. 1982); *see In re Arlumsa Development Corp.*, 33 B.R. at 982-83. As discussed above, Amanat has engaged in numerous acts of misconduct, ranging from his defrauding of his business partner, Waltzer, to his fraudulent concealment of assets to this collusive bankruptcy proceeding.

77. Because Waltzer is without question a bona fide petitioner, the instant petition can no longer be dismissed as a mere fraud on the Court.

**The Finding Of Fraud And Breach Of Fiduciary
Duty In The Waltzer Action And The Allegations
Of Fraud Against Amanat In Other Cases
Support The Imposition Of An Interim Trustee**

78. As discussed above, the Waltzer Action established that Amanat had breached his fiduciary duty to Waltzer and defrauded Waltzer into selling his interest in Tradescape for a small fraction of what it was worth. This finding demonstrates that Amanat cannot be trusted to honestly account for his assets and administer the estate.

79. In its lawsuit against Amanat, Bridges alleges that he engaged in acts of fraud in connection with the agreement that he would invest in the company in exchange for an ownership interest.

**Amanat's History Of Defying Court Orders Shows
That He Cannot Be Trusted To Obey This Court**

80. Amanat's misconduct during the Waltzer Action necessitates the appointment of an interim trustee.

81. Amanat violated six discovery orders entered between December 2002 and December 2003 compelling him to produce thousands of pages of material documents including documents relating to his personal finances. *See* the December 11, 2003 Order which recites the prior orders.

82. Many of the requested documents concerned financial matters relating to Amanat's business, Tradescape.

83. Amanat's misconduct was so egregious that the court in the Waltzer Action found it was "willful and contumacious" and ordered his answer to be struck.

**An Interim Trustee Should Be Appointed Because Amanat
Claims To Be Unaware Of The Status Of His Finances**

84. Further evidence that Amanat was and is actively engaged in concealing assets, was his bizarre testimony during the Waltzer Action that he was unaware of (i) how his debts were paid and (ii) into which account his salary was deposited.

85. In his depositions in the Waltzer Action, Amanat offered incredible testimony that he "could not recall" or "did not know" or "did not remember" even the most basic facts about his recent finances.

86. Amongst other things Amanat does not know:

- If he owns his house in Queens.
- How he came to own it.
- Who lives in the house.
- How much rent the tenant pays.
- What stocks are in his one and only brokerage account.
- Who is the trustee of the Omar Amanat Trust which he set up for his children and which holds 20 % of the stock of MarketXT, assets that Amanat believes to be worth tens of millions of dollars.
- Whether or not he is the trustee of the Sharif Amanat Trust which his father set up for Amanat's children and siblings and which holds 40 % of the stock of MarketXT.
- How much money he received from the Omar Amanat Trust in consideration for his transfer of 20 % of the shares of MarketXT.
- Whether he paid $1.6 million or $3 million for his $6 million worth of preferred stock in MarketXT.
- What are the names of the people who lent him the money to buy the preferred stock.
- How much he received in salary from MarketXT in 2003.
- How much he received in salary from MarketXT in 2004.

Amanat 1/8/04 Dep. P 70/L16 to P 71/L 22; P 76/L22-24; P 106/l6 to P 109/L25; P 110/l2-5; P 203/L 2-19;  P 203/L 22 to P 204/L20.  Amanat 4/30/04 Dep. P 246/L 3-16; P 260/L 9-20; P 263/L 23 to P 264/L 7.

87. Although Amanat claimed in his April 30, 2004 deposition in the Waltzer Action that he did not know who is the trustee of the Omar Amanat Trust, he knew just one week earlier, in an April 23, 2004 deposition in another case, that he was the trustee. A copy of the relevant pages from his April 23, 2004 deposition in *Ignall v. Amanat*, N.Y. Sup. Ct. N.Y. Co., Index No. 102747/2003, is attached as Exhibit Y to the separately bound set of Exhibits.

## THE TEST FOR APPOINTING AN INTERIM TRUSTEE

88. An interim trustee will be appointed under 303(g) when it is "necessary to preserve the property of the estate." *E.g., In re Alpine Lumber & Nursery*, 13 B.R. 977, 979 (Bankr. S.D. Cal. 1981). Bankruptcy Courts in New York have appointed an interim trustee where the debtor was shown to have diverted, depleted or secreted assets. *Gems N' Things Inc.*, 60 B.R. 288 (Bankr. S.D.N.Y., 1986); In *re Lollypop, Inc.,* 205 B.R. 682 (Bankr. E.D.N.Y., 1997) *see also Nina Merchandise Corporation,* 5 B.R. 743 (Bankr. S.D.N.Y. 1980). Interim trustees have been installed in instances where the court has found that it would prevent concealment, waste, or loss of assets by the alleged debtor, In re Alpine Lumber & Nursery, 13 B.R. at 979; In re Rush, 10 B.R. 518, 523 (Bankr. N.D.Ala. 1980).

## ONLY A MINIMAL BOND SHOULD BE REQUIRED

89. Bankruptcy Rule 2001(b) requires that Waltzer furnish a bond conditioned to indemnify Amanat for "costs, attorney's fee, expenses, and damages allowable under 303(i) of the [Bankruptcy] Code." Given the facts of this case, including Waltzer's $6,665,210 Judgment against Amanat, this Court should require only a minimal bond. When Waltzer obtained his pre-judgment Order of Attachment in the Waltzer Action, in the amount of $10,504,547.68, he was required by the Supreme Court to post a $500 bond. *See* Order of Attachment, Exh. I. The same amount should be used here. The Bond required under Rule 2001(b) should be fixed in the amount of $500.

## THE INSTANT MOTION MUST BE HEARD ON AN EXPEDITED BASIS

90. For all the reasons that an interim trustee is needed, the instant application must be heard on an expedited basis.

## SPECIAL PROVISIONS FOR SERVICE OF THE MOTION PAPERS

91. Because of the shortened notice period for the instant motion, this Court should make special provisions regarding the service of the instant motion papers.

92. This is a contested motion under Bankr. Rule 9014(b) which requires that the motion papers be served pursuant to Bankr. Rule 7004.  Rule 7004(b)(1) and (9) permits service on the debtor by first class mail to his dwelling business or designated address.  In addition to service by regular mail, the motion papers should be served by over-night carrier.

93. Given Debtor's past efforts to evade service in the past, this form of service is appropriate.  *See* the affidavits of the process serves in the Waltzer Action for a description of their efforts to serve Amanat with papers after the Judgment was entered. Copies of the affidavits of service are attached collectively as Exhibit Z to the separately bound set of Exhibits.

## NO PREVIOUS APPLICATION

94. No previous application has been made for the relief requested herein.

## CONCLUSION

95. For the reasons set forth above, Waltzer's motion should be granted in all respects.

96. I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 17, 2004

  /s/  Eric R. Levine_
Eric R. Levine